Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Melissa D. Medilien, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General*
*Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
COMPANY,

                    Plaintiffs,

          -against-

IVAN LAM, D.C.,
NEW YORK CORE CHIROPRACTIC, P.C., and
JOHN DOE DEFENDANTS "1"–"10,"

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket
No.:_____ (     )

**Plaintiff Demands
a Trial by Jury**

<u>**COMPLAINT**</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants Ivan Lam, D.C., New York Core

Chiropractic, P.C., and John Doe Defendants "1" through "10" (collectively, the "Defendants"),

hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $80,400.00 that Defendants wrongfully obtained from GEICO, and further seeks to extinguish more than $1,398,000.00 in pending fraudulent billing, resulting from Defendants' submission of thousands of fraudulent "no-fault" insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable healthcare services, including bogus patient examinations and pain fiber nerve conduction studies ("PfNCS") (collectively, the "Fraudulent Services"), which allegedly were provided to New York automobile accident victims insured by GEICO ("Insureds").

2.      Defendant Ivan Lam, D.C. ("Lam") is the record owner of the Defendant, New York Core Chiropractic, P.C. ("Core Chiro"), which purported to be a legitimate professional corporation, but which billed GEICO and other New York automobile insurers for the excessive and medically useless Fraudulent Services.  Lam, conspiring with unlicensed laypersons John Doe Defendants "1" through "10", used Core Chiro to exploit New York's No-fault insurance system by operating it on a transient basis at a series of multidisciplinary medical clinics where Core Chiro rendered the Fraudulent Services pursuant to pre-determined protocols -- to the extent that the services were provided at all – solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

3.      As an essential part of the fraudulent scheme, Defendants entered into illegal, referral and kickback arrangements to permit Core Chiro to access a steady stream of stream of automobile accident victims who Defendants subjected to the Fraudulent Services. Defendants used purported payments of sham rent, sham business expenses, and cashing of checks to fuel the payments of kickbacks for patient referrals at the medical clinics.

4.      GEICO seeks to recover the monies stolen from it and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,398,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Core Chiro because:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)     the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others;

(i)      the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(ii)     in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors rather than by employees of Core Chiro, and therefore were unreimbursable.

5.      The Defendants fall into the following categories:

(i)      Defendant Lam is a chiropractor licensed to practice chiropractic in the State of New York, who purports to own Core Chiro and who purported to perform some of the Fraudulent Services.

(ii)     Defendant Core Chiro is a New York chiropractic professional corporation, through which the Fraudulent Services purportedly were performed and were billed to New York automobile insurance companies, including GEICO.

(iii)    John Doe Defendants "1"-"10" are individuals and entities presently not identifiable but who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of Core Chiro and the provision of medically unnecessary services, engaging in kickback arrangements involving the referral of Insureds to Core Chiro, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.      As discussed herein, the Defendants at all relevant times have known that (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were

provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback and patient referral arrangements; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of Lam or Core Chiro.

7.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to GEICO.

8.      The chart annexed hereto as Exhibit "1" set forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO.

9.      The Defendants' fraudulent scheme began in 2016 and has continued uninterrupted through present day, as Core Chiro continues to seek collection on pending charges for the Fraudulent Services.

10.      As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $80,400.00.

**THE PARTIES**

I.    **Plaintiffs**

11.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska

corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II. <u>Defendants</u>

12.     Defendant Lam resides in and is a citizen of New York.  Lam was licensed to practice chiropractic in New York on July 16, 2014 and serves as the nominal owner of Core Chiro.

13.     Defendant Lam is no stranger to no-fault insurance fraud schemes.  In fact, Lam was named a defendant in a lawsuit alleging that Lam participated in a scheme to submit fraudulent charges for medically unnecessary services perpetrated through, among other things, illegal financial and referral arrangements.  See <u>e.g.</u>, <u>State Farm Mutual Automobile Insurance Company v. Cecile I. Fray M.D., P.L.L.C., et al.</u>, 1:19-cv-04765 (E.D.N.Y. 2019).

14.     Defendant Core Chiro is a New York professional corporation incorporated on or about January 11, 2016, with its principal place of business in New York, and purports to be owned and controlled by Lam.  Core Chiro has been used by Lam and John Doe Defendants "1"-"10" to submit fraudulent billing to GEICO and other insurers.

15.     Upon information and belief, John Doe Defendants "1"-"10" reside in and are citizens of New York.  John Doe Defendants "1"-"10" are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of Core Chiro and the provision of medically unnecessary services, engaging in kickback arrangements involving the referral of Insureds to Core Chiro, and spearheading the pre-determined fraudulent protocols used to maximize profits, without regard to genuine patient care.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

17.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

18.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

20.     GEICO underwrites automobile insurance in New York.

### I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement

21.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

23.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

24.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

25.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

27.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

28.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv)

absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

29.     Unlicensed non-physicians may <u>not</u>: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

30.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  <u>See, e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

31.     New York law prohibits unlicensed persons not authorized to practice a profession, like chiropractic, from practicing the profession and from sharing in the fees for professional services.  <u>See, e.g.</u>, New York Education Law § 6512, § 6530(11), and (19).

32.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments rendered or allows unlicensed laypersons to share in the fees for the professional services.

33.     Pursuant to the No-Fault Laws, only health care providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health

care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

34. Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the underline_actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

35. In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

36. When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

37. Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

II.       **Defendants' Fraudulent Scheme**

       A.  **Overview of the Scheme**

38.       Beginning in 2016, and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which Core Chiro was used to bill GEICO over $1,596,000.00 dollars for medically unnecessary, illusory, and otherwise unreimbursable services (i.e, the "Fraudulent Services").

39.       The Fraudulent Services billed under the name of Core Chiro were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render healthcare services.

40.       Although Lam presented Core Chiro as a legitimate professional corporation, Lam conspired with the other Defendants to use Core Chiro to exploit the New York no-fault insurance system by subjecting automobile accident victims to the Fraudulent Services.

41.       Lam and Core Chiro did not treat automobile accident victims at any single, fixed practice location.

42.       Defendants, instead, operated Core Chiro on an itinerant basis from various multidisciplinary medical clinics that primarily treated No-Fault patients, primarily located in Brooklyn and the Bronx, where Core Chiro received steady volumes of patients through no efforts of its own, including at the following clinics (collectively, the "Clinics"):

- 1220 East New York Avenue, Brooklyn;
- 550 Remsen Avenue, Brooklyn;
- 665 Pelham Parkway, Bronx;
- 3910 Church Avenue, Brooklyn;
- 615 Seneca Avenue, Ridgewood;
- 1500 Astor Avenue, Bronx;

- 546 Howard Avenue, Brooklyn;
- 3041 Avenue U, Brooklyn;
- 625 East Fordham Road, Bronx;
- 3491 3rd Avenue, Bronx.

43.     Lam did not market Core Chiro's transient practice at the Clinics to the general public.

44.     Lam did not advertise for patients for the transient practice, never sought to build name recognition to draw legitimate business to the transient practice and did virtually nothing that would be expected of the owner of a legitimate healthcare practice to develop its reputation and attract patients.

45.     Lam was actually unfamiliar with fundamental aspects of Core Chiro's operations, including not even knowing the names of other healthcare providers who purported to provide services on behalf of Core Chiro's transient practice.

46.     Lam did not offer a variety of chiropractic treatments and services through Core Chiro at the Clinics as typically would be expected of a licensed chiropractor legitimately treating individuals involved in automobile accidents.

47.     Core Chiro's services at the Clinics were almost entirely focused on the Fraudulent Services (i.e., bogus patient examinations and pain fiber nerve conduction studies ("PfNCS")).

48.     Lam, tellingly, never offered or provided PfNCS to any other chiropractic patients that he treated, other than the patients at the Clinics who were covered by No-fault insurance.

### B.  The Illegal Kickback and Referral Relationships

49.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

50.     The Clinics provided facilities for Core Chiro, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

51.     In fact, GEICO received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

52.     For example, GEICO received billing for purported healthcare services rendered at the clinic located at 1500 Astor Place, Bronx, from a "revolving door" of more than 60 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than ten different chiropractic "names", including 21 Century Chiropractic Care, PC, Brefni Chiropractic Diagnostics, PC, Supreme Health Chiropractic, PC, Chiropractic Quality Care, PC, Future Chiropractic Care, PC, Direct Chiropractic Care, PC, JB Chiropractic Services, PC, and billing from Lam's chiropractic professional corporation, Core Chiro.

53.     As a further example, GEICO received billing for purported healthcare services rendered at the clinic located at 550 Remsen Avenue, Brooklyn from a "revolving door" of more than 100 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than fifteen different chiropractic "names", including Supreme Health Chiropractic, PC, Shashek Chiropractic, PC, Pro

Align Chiropractic, PC, Pro Edge Chiropractic, PC, Remedy Chiropractic, PC, Morris Park Chiropractic, PLLC, Attentive Chiropractic Wellness, PC, Direct Chiropractic Care, PC, JB Chiropractic Services, PC, Brook Chiropractic of NY, PC, and billing from Lam's chiropractic professional corporation, Core Chiro.

54.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 615 Seneca Avenue, Queens, from a "revolving door" of more than 100 purportedly different healthcare providers. The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than fifteen different chiropractic "names", including Aries Chiropractic, PC, Atlantic Chiropractic, PC, Pro Align Chiropractic, PC, Park Avenue Chiropractic & Health Care, PC, Corona Family Chiropractic, PC, Queens Chiropractic Care, PC, Pro Edge Chiropractic, PC, Chiropractic Performance Services, PC, State Chiropractic, PC, Spine First Chiropractic, PLLC, Pioneer Chiropractic, PC, Real Chiropractic Care, PC, Lawrence Chiropractic Diagnostic Services, PC, Whiplash Chiropractic, PC, Spinal Pro Chiro, PC. MDJ Chiropractic Wellness, PC, Dos Manos Chiropractic, PC, Razman Chiropractic, PC., and billing from Lam's chiropractic professional corporation, Core Chiro.

55.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 1220 East New York Avenue, Brooklyn, from a "revolving door" or more than 75 purportedly different health care providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than ten different chiropractic "names", including Stone Chiropractic, PC, Alen Oven Chiropractic Care, PC, Direct Chiro Care, PC, Nerve Diagnostic Chiropractic, PC, New Beginning Chiropractic, PC, Pro Align Chiropractic, PC, Pro Edge Chiropractic, PC, Professional Chiropractic Care, PC, Supreme Health Chiropractic,

PC, Total Chiropractic, PC, Body Works Chiropractic, PC., and billing from Lam's chiropractic professional corporation, Core Chiro.

56.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 3910 Church Avenue, Brooklyn, from a "revolving door" or more than 100 purportedly different health care providers. The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than fifteen different chiropractic "names", including RIU Chiropractic, PC, DMB Chiropractic, PLLC, Easy Access Chiropractic, PC, Emis Chiropractic, PC, Sun Chiropractic Services, PC, Maz Chiropractic, PC, VP Chiropractic Adjustment, PC, JRK Chiropractic Care, PC, Sasha Chiropractic, PC, Anni Chiropractic, PC, JB Chiropractic Services, PC, Chiropractic Diagnostic, PC, MDJ Chiropractic Wellness, PC, RF Chiropractic Imaging, PC, Dos Manos Chiropractic, PC, Crosstown Chiropractic, PC, and billing from Lam's chiropractic professional corporation, Core Chiro.

57.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits without regard to actual patient care.

58.     For example, a physician who worked at the 3910 Church Avenue, Brooklyn location stated under oath that he ended his involvement with the Clinic at that location because of, among other things, (i) his concern about the manner in which patients were brought to the Clinic; (ii) the manner in which the Clinic was operated; (iii) the use of his signature stamp without his consent; and (iv) the submission of billing for services through his personal tax identification number without his consent.  In fact, many of the medical providers at that location were named as defendants in a federal RICO action where GEICO credibly alleged that the location was owned and controlled by laypersons and the medical providers performed medically unnecessary services based

on the improper financial (and other) relationships among the defendants and laypersons.  See Government Employees Insurance Co., et al., v. East Flatbush Medical, P.C., et al., 20-CV-1695 (E.D.N.Y. 2020).

59.     As a further example, a chiropractor who worked at the 625 East Fordham Road, Bronx Clinic stated under oath that (i) the clinic was owned by three brothers who were neither doctors nor licensed medical professionals; (ii) the brothers advised him that they actually owned the medical professional corporation that was the leaseholder at the location, even though none of the brothers were licensed medical providers; and (iii) prescriptions for durable medical equipment that contained the chiropractor's name were not signed by the chiropractor nor authorized by him, and were issued without his knowledge and consent.

60.     As a further example, one of the physicians who worked at the 1500 Astor Avenue, Bronx Clinic stated under oath that the "non-professional staff at the location . . . was controlling the day-to-day operations."

61.     The Defendants, in order to obtain access to the Clinics' patient base (i.e. Insureds) for Core Chiro, entered into illegal financial arrangements with unlicensed persons who "brokered" or "controlled" patients who were treated, or who purported to be treated, at the Clinics.

62.     The financial arrangements that Defendants entered into on behalf of Core Chiro included the payment of fees ostensibly to "rent" space from the No-Fault Clinics or fees for ostensibly legitimate business services.

63.     However, Lam and Core Chiro's payment of fees ostensibly to "rent" space from the No-Fault Clinics or fees paid for ostensibly legitimate business services were actually "pay-to-play" arrangements that amounted to kickback payments for having Insureds steered to Core Chiro for the medically unnecessary Fraudulent Services.

64.     In keeping with the fact that the ostensibly legitimate "rent" payments by Lam and Core Chiro were actually disguised kickbacks in exchange for patient referrals, the amounts of the "rental" payments were far in excess of the legitimate, fair market value of the putative non-exclusive use of the clinic locations.

65.     Specifically, Lam and Core Chiro paid between $500.00 and $1,000.00 per month in "rent" at multiple Clinics, despite the fact that Lam and Core Chiro only used small, non-exclusive space at a given Clinic approximately twice per month.

66.     In keeping with the fact that Lam also paid for ostensibly legitimate business services that were actually disguised kickbacks in exchange for patient referrals, Lam and Core Chiro issued payments totaling more than $150,000.00 from Core Chiro's own corporate account to an entity known as W.I.P. Holding, Inc. ("W.I.P. Holding"), which provides no legitimate products or services.

67.     In further keeping with the fact that Lam paid for ostensibly legitimate business services that were actually disguised kickbacks in exchange for patient referrals, Core Chiro's collection attorneys made similar payments on behalf of Core Chiro, again totaling more than $150,000.00, to the same entity, W.I.P. Holding, which provides no legitimate products or services.

68.     The payments to W.I.P Holding were often made through separate checks issued on the same date.

69.     For example, eight separate checks dated July 24, 2019 were issued on Core Chiro's behalf to W.I.P. Holding, totaling more than $70,000.00.

70.     W.I.P. Holding itself issued numerous checks that were exchanged for cash at a check-cashing facility, sometimes using a false corporate resolution and forged letter from the Internal Revenue Service.

71.     In further keeping with the fact that Lam paid for ostensibly legitimate business services that were actually disguised kickbacks in exchange for patient referrals, Core Chiro also issued payments totaling over $40,000.00 from its corporate bank account to a law firm for purported legal services.  The owner of this law firm affirmed under oath that neither he nor his law firm (i) provided any services to Core Chiro; and (ii) ever received payment from Core Chiro.

72.     Some, if not all, of the checks issued by Core Chiro to the law firm were cashed at a check cashing facility using false documentation.

73.     Lam and Core Chiro, together with unlicensed laypersons John Doe Defendants "1" through "10", used the payments of sham rent, sham business expenses, and cashing of checks to fuel the payments of kickbacks for patient referrals at the Clinics.

74.     As a result of the kickback payments made by Defendants, Core Chiro received referrals of Insureds that it then subjected to the medically unnecessary Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

75.     The amount of the kickbacks paid by the Defendants generally was based on the volume of Insureds that were steered to Core Chiro for the purported medically unnecessary services.

76.     Lam had no genuine doctor-patient relationship with the Insureds who visited the Clinics, as the patients had no scheduled appointments with Core Chiro.  Instead, the Insureds were simply directed by the Clinics, and the unlicensed persons associated therewith, to subject

themselves to treatment by whatever healthcare provider was working for Core Chiro that day, because of the kickbacks paid by Lam and Core Chiro.

77.     The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme.  The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

78.     Lam at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

### C.  The Defendants' Fraudulent Treatment and Billing Protocol

79.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentation.

80.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. Rather, Lam and the other Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent billing submitted to GEICO and other insurers.

### 1.  The Fraudulent Charges for Initial Examinations

81.     Upon receiving a referral pursuant to the kickbacks that Lam and Core Chiro paid in connection with Core Chiro's work at the Clinics, the Defendants purported to provide many of the Insureds in the claims identified in Exhibits "1" with an initial examination.

82.     In keeping with the fact that the initial examinations were performed pursuant to the kickbacks that Lam and Core Chiro paid, Core Chiro virtually always purported to perform the

initial examinations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

83.     Core Chiro typically billed the initial examinations under CPT code 99203, typically resulting in a charge of $54.30 or $54.74, though sometimes much higher.

84.     The charges for the initial examinations were fraudulent in that Lam purported to perform the examinations to determine whether to subject Insureds to medically unnecessary PfNCS tests.

85.     Tellingly, on those occasions when Lam was not available to "visit" the Clinics and conduct the initial examinations purportedly to determine whether to subject Insureds to medically unnecessary PfNCS tests, technicians working for Core Chiro often proceeded to perform the PfNCS tests on the Insureds without any initial examination being performed first by anyone on behalf of Core Chiro.

86.     Core Chiro's examinations were medically unnecessary and were performed – to the extent they were performed at all – solely as a billing opportunity for Lam without regard for his stated purpose of the examination, *i.e.*, purportedly to determine whether the Insureds needed PfNCS testing.

87.     Furthermore, as discussed in detail below, Core Chiro's examinations were medically unnecessary because the performance, or alleged performance of the PfNCS tests, was fraudulent in that, among other things, there is no legitimate medical evidence that PfNCS tests are in any way useful, let alone medically necessary, to diagnose or treat the Insureds in the manner suggested by Defendants.

88.     Core Chiro's charges for the initial examinations also were fraudulent as they were performed – to the extent they were performed at all – pursuant to the kickbacks that the

Defendants paid at the Clinics in coordination with John Doe Defendants "1"-"10", not to treat or otherwise benefit the Insureds.

89.     Moreover, the charges for the initial examinations were fraudulent in that they misrepresented the nature and extent of the initial examinations.

90.     For example, in every claim identified in Exhibit "1" for initial examinations under CPT code 99203, the Defendants misrepresented and exaggerated the amount of face-to-face time that the examining healthcare professional spent with the Insureds or the Insureds' families.

91.     The use of CPT code 99203 typically requires that a healthcare professional spend 30 minutes of face-to-face time with the Insured or the Insured's family.

92.     Though the Defendants billed for most of their initial examinations under 99203, no healthcare professional associated with the Defendants spent 15 minutes, let alone 30 minutes, on an initial examination.  Rather the initial examinations in the claims identified in Exhibit "1" rarely lasted more than 10-15 minutes.

93.     In keeping with the fact that the initial examinations rarely lasted more than 10-15 minutes, Lam and Core Chiro used checklist forms in purporting to conduct the initial examinations.  The checklist forms that Lam and Core Chiro used in conducting the initial examinations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

94.     All that was required to complete the checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds.  These interviews and examinations did not require the Defendants to spend more than 10-15 minutes of face-to-face time with the Insureds during the putative initial examinations.

95.     Further, pursuant to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99203, or caused them to be submitted, they falsely represented that a healthcare professional associated with Core Chiro: (i) took a "detailed" patient history; and (ii) conducted a "detailed" physical examination.

96.     Pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician take a review of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

97.     However, Defendants did not take a "detailed" patient history from Insureds during the initial examinations, inasmuch as they did not review systems related to the patients' presenting problems and did not conduct any review of a limited number of additional systems.

98.     Rather, after purporting to provide the initial examinations, the Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

99.     Moreover, pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

100.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)      examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)      palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      brief assessment of mental status;

(vi)      examination of gait and station;

(vii)      inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)      coordination;

(ix)      examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)      examination of sensation.

101.    When the Defendants billed for the initial examinations under CPT code 99203, they falsely represented that they performed a "detailed" patient examination on the Insureds they purported to treat during the initial examinations.

102.    In fact, the Defendants did not conduct a detailed patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

**2.**    **The Fraudulent Charges for Electrodiagnostic Testing by Core Chiro**

103.    As set forth in Exhibit "1", Defendants also purported to subject the Insureds in the claims identified in Exhibit "1" to a series of medically unnecessary and useless PfNCS test billed through the Core Chiro.

104.    The charges for the PfNCS tests were fraudulent in that the PfNCS tests were medically unnecessary and were performed – to the extent that they were performed at all –

pursuant to the Defendants' fraudulent treatment protocol and the kickbacks that Lam and Core Chiro paid at the Clinics, not to treat or otherwise benefit the Insureds.

### a.    The Human Nervous System and Electrodiagnostic Testing

105.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

106.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

107.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

108.    The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

109.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation and loss of muscle control.

110.    PfNCS tests are purportedly a form of electrodiagnostic testing, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

111.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

112.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation. A copy of the Recommended Policy is annexed hereto as Exhibit "1".

113.    The Recommended Policy does not identify PfNCS tests as having any documented utility in diagnosing radiculopathies.  See Exhibit "1".  In fact, PfNCS tests are not recognized as having any value in the diagnosis of any medical condition.

**b.    The Fraudulent PfNCS Tests**

114.    As part of the fraudulent treatment protocol and kickback scheme, the Defendants purported to subject Insureds to medically unnecessary PfNCS tests.

115.    The charges for the PfNCS tests were fraudulent in that the PfNCS tests were medically unnecessary and performed, not to treat or otherwise benefit the Insureds, but instead pursuant to the Defendants' predetermined treatment protocol and improper financial and referral arrangements between the Defendants and others.

116.    The Defendants billed the PfNCS tests to GEICO through Core Chiro as multiple charges under CPT code 95999 generally resulting in multiple charges of more than $1,000.00 for each Insured on whom the PfNCS testing purportedly was performed.

### (i)      Legitimate Tools for Radiculopathy Diagnosis

117.    The Defendants supposedly provided the PfNCS test to Insureds in order to diagnose radiculopathies, which are a type of neuropathy.

118.    There are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities (i.e., neuropathies) in the peripheral nerves and in the nerve roots (i.e., radiculopathies).  These diagnostic tests are NCV tests, EMG tests, and magnetic resonance imaging tests ("MRIs").

119.    MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue, and nerves inside the human body.  MRIs often are used following auto accidents to diagnose abnormalities in the nerve roots through the images of the nerves, nerve roots, and surrounding areas.

### (ii)      The Medically Useless PfNCS Tests

120.    The PfNCS "test" is a type of sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots.  It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

121.    The PfNCS tests are performed by administering an electrical stimulus at specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face.  The voltage is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage.  "Findings" then are made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

122.    If the patient's sensation threshold is greater than the purported normal range of voltage required to evoke a sensation, it allegedly indicates that the patient has a hypoesthetic

condition (i.e., that the patient's sensory nerves have decreased function).  If the voltage required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it allegedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

123.    In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in PfNCS testing.

124.    Specifically, there is no reliable evidence of the existence of normal ranges of intensity or voltage required to evoke a sensation using a PfNCS test device.  Given the lack of evidence of normal ranges of intensity required to evoke a sensation, it is impossible to determine whether any given Insured's personal PfNCS test results are normal or abnormal.

125.    Even if there was some evidence of the existence of normal ranges of intensity required to evoke a sensation using a PfNCS test device, there is no reliable evidence to prove that a sensation threshold greater than the normal range would indicate a hypoesthetic condition or that a sensation threshold less than the normal range would indicate a hyperesthetic condition.

126.    Similarly, even if an abnormal sensation threshold indicated either a hypoesthetic or hyperesthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from PfNCS tests.  Indeed, numerous pathological and physiological conditions other than peripheral nerve damage can cause hyperesthesia and hypoesthesia.

127.    Furthermore, even if PfNCS tests could produce any valid diagnostic information regarding the sensory nerve fibers:

> (i)    no reliable evidence proves that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

     (ii)    no reliable evidence proves that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

     (iii)    no reliable evidence proves that any such information would indicate the specific location of the abnormality along the sensory nerve pathways; and

     (iv)    PfNCS tests do not provide any information regarding the motor nerves or motor nerve roots, which are as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident.

128.    Simply put, no legitimate medical evidence supports the conclusion that PfNCS tests are in any way useful, let alone medically necessary, to diagnose neuropathies in general or radiculopathies in particular.

129.    Notably, the Centers for Medicare & Medicaid Services ("CMS") have determined that PfNCS tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and radiculopathies, and therefore are not compensable.

130.    In keeping with the fact that the Defendants' putative PfNCS tests were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for PfNCS tests.

131.    In keeping with the fact that the Defendants' purported PfNCS tests were medically useless, the putative "results" of the Defendants' PfNCS tests were not incorporated into any Insured's treatment plan, and the PfNCS tests played no genuine role in the treatment or care of the Insureds.

     **(iii)    Each of the Two Main PfNCS Test Device Manufacturers Claims the Other is a Fraud**

132.    Until 2004, about the same time that CMS was considering the medical benefits of PfNCS testing before ultimately issuing its National Coverage Determination that denied Medicare

coverage of PfNCS tests, the two primary manufacturers of sensory nerve conduction threshold devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

133.    Neurotron, Inc. manufactured a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purported to provide quantitative data on sensory nerve conduction threshold.

134.    In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II".

135.    Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

136.    Neuro Diagnostic Associates, Inc., now known as PainDx., Inc., claims that the Neurometer does not produce valid data or results and has been fraudulently marketed.  For its part, Neurotron Inc. has asserted the same claims regarding Neuro Diagnostic Associates, Inc.'s Medi-Dx 7000/Axon-II.

137.    Upon information and belief, the Defendants utilized either a Neurometer or Axon-II to perform PfNCS testing on Insureds.

c.    **Defendants' Medically Unnecessary PfNCS Tests**

138.    Pursuant to their pre-determined treatment protocol and improper financial and kickback arrangements to steer patients to Core Chiro, Core Chiro purported to subject virtually all Insureds to a series of medically unnecessary PfNCS tests.

139.    The Defendants billed the PfNCS tests to GEICO through Core Chiro under CPT code 95999.  Often, the Defendants billed GEICO for two PfNCS, one cervical PfNCS and one

lumbar PfNCS, for an Insured on the same date of service, generally resulting in charges totaling between $2330.56- $4701.12 for each Insured on whom the PfNCS testing purportedly was performed.

140. The Defendants purported to subject Insureds to PfNCS tests, supposedly to diagnose neuropathies or radiculopathies.

141. As a threshold matter, the PfNCS tests were medically unnecessary because, for all the reasons discussed at length above, there is no legitimate medical evidence that PfNCS tests are useful in diagnosing any medical condition, let alone neuropathies or radiculopathies.

142. The PfNCS tests were also medically unnecessary because Insureds who purportedly were subjected to Defendants' PfNCS tests also received NCVs, EMGs, and/or MRIs, services which are performed to properly diagnose neuropathies or radiculopathies.

139. Even if the PfNCS tests purportedly provided by Core Chiro had any legitimate value in the diagnosis of neuropathies or radiculopathies, they were duplicative of the NCV tests, EMG tests, and/or MRIs that the Insureds received and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the PfNCS tests that Core Chiro purported to provide.

143. Though unsupported by any legitimate medical evidence, the alleged benefit of PfNCS tests is their supposed capability of diagnosing abnormalities in sensory nerves less than 14-21 days following an accident, which is sooner than NCV tests and EMG tests can be used to effectively diagnose axonal damage following an accident.

144. Assuming that claim had substance (it does not), Core Chiro frequently purported to provide PfNCS tests to Insureds more than 21 days after an Insured's accident, the point in time at which NCV and EMG tests can effectively diagnose nerve damage.

For example:

(i)     Insured KC was involved in a motor vehicle accident on October 30, 2018. Despite the fact that NCV and EMG tests would have been effective, Core Chiro rendered medically unnecessary PfNCS testing on February 7, 2019, 100 days later;

(ii)    Insured WC was involved in a motor vehicle accident on January 6, 2019. Despite the fact that NCV and EMG tests would have been effective, Core Chiro rendered medically unnecessary PfNCS testing on February 18, 2019, 43 days later;

(iii)   Insured GA was involved in a motor vehicle accident on November 29, 2018. Despite the fact that NCV and EMG tests would have been effective, Core Chiro rendered medically unnecessary PfNCS testing on January 10, 2019 and February 19, 2019, 42 days later and then again 82 days later;

(iv)    Insured DA was involved in a motor vehicle accident on November 12, 2018. Despite the fact that NCV and EMG tests would have been effective, Core Chiro rendered medically unnecessary PfNCS testing on February 7, 2019, 87 days later;

(v)     Insured MM was involved in a motor vehicle accident on October 16, 2018. Despite the fact that NCV and EMG tests would have been effective, Core Chiro rendered medically unnecessary PfNCS testing on November 13, 2018,  28 days later;

(vi)    Insured KM was involved in a motor vehicle accident on August 6, 2018. Despite the fact that NCV and EMG tests would have been effective, Core Chiro rendered medically unnecessary PfNCS testing on January 9, 2019, 156 days later;

(vii)   Insured MK was involved in a motor vehicle accident on September 13, 2018. Despite the fact that NCV and EMG tests would have been effective, Core Chiro rendered medically unnecessary PfNCS testing on January 10, 2019, 119 days later;

(viii)  Insured KM was involved in a motor vehicle accident on December 20, 2018. Despite the fact that NCV and EMG tests would have been effective, Core Chiro rendered medically unnecessary PfNCS testing on February 5, 2019, 47 days later;

(ix)    Insured JV was involved in a motor vehicle accident on December 28, 2018. Despite the fact that NCV and EMG tests would have been effective, Core Chiro rendered medically unnecessary PfNCS testing on February 27, 2019, 62 days later; and

(x)   Insured BV was involved in a motor vehicle accident on July 20, 2018. Despite the fact that NCV and EMG tests would have been effective, Core chiro rendered medically unnecessary PfNCS testing on January 24, 2019, 188 days later.

145.   In keeping with the fact that the PFNCS tests purportedly rendered were medically unnecessary and were part a part of the Defendants' fraudulent treatment scheme to bill insurers, in some instances Core Chiro purported to repeat both cervical and lumbar PfNCS tests on insureds on subsequent dates.

146.   Under the circumstances in which they were employed by the Defendants, the purported PfNCS tests were medically unnecessary.

**(c)     The Fraudulent Billing for Independent Contractor Services**

147.   The Defendants' fraudulent scheme also included the submission of claims to GEICO on behalf of Core Chiro seeking payment for services provided by independent contractors.

148.   Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

149.   Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify

position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

150.    Although Lam purported to employ two technicians, Lam was the only healthcare service provider actually employed by Core Chiro.

151.    In keeping with the fact that Lam was the only health care service provider actually employed by Core Chiro, Lam, when asked, did not know whether his two purported technician were employed by a PfNCS company or how either became certified to administer PfNCS testing.

152.    In fact, Lam and Core Chiro utilized technicians and a series of treating healthcare providers to perform the Fraudulent Services at the Clinic Locations (the "Treating Providers"), including at least five healthcare providers that have billed GEICO through Core Chiro for treatment purportedly provided to Insureds.

153.    Lam did not know that other healthcare providers were rendering, or purporting to render, services on behalf of Core Chiro and, when provided with the opportunity to identify Core Chiro's employees, Lam did not identify any of the five healthcare providers as an employee of Core Chiro.

154.    Furthermore, the healthcare professionals working under the name of Core Chiro did not exclusively provide services for Core Chiro.

155.    For example, one of the treating providers who billed GEICO through Core Chiro in November 2018, also billed GEICO through two other service provider names, including through the Treating Provider's own name, in the same month.

156.    As a further example, a second treating provider who billed GEICO through Core Chiro for services purportedly provided in August 2018, also billed GEICO on behalf of another medical corporation in the same month.

157.    The Defendants routinely submitted charges to GEICO and other insurers for Fraudulent Services that purportedly were performed by healthcare professionals other than Lam.

158.    The healthcare professionals working under the names of Core Chiro set their own work schedules or had their schedules set for them by the John Doe Defendants "1"-"10".

159.    The healthcare professionals working under the name of Core Chiro worked without any supervision by Lam – or even without Lam knowing that worked at all for Core Chiro.

160.    To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare services providers other than Lam were performed by healthcare professionals whom the Defendants treated as independent contractors.

161.    For instance, the Defendants:

(i)      paid the health care professionals, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)     established an understanding with the health care professionals that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to the health care professionals;

(iv)     failed to secure and maintain W-4 or I-9 forms for the professionals;

(v)      failed to withhold federal, state, or city taxes on behalf of the health care professionals;

(vi)    compelled the health care professionals to pay for their own malpractice insurance at their own expense;

(vii)    permitted the health care professionals to set their own schedules and days on which they desired to perform services;

(viii)    permitted the health care professionals to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices;

(ix)    failed to cover the health care professionals for either unemployment or workers' compensation benefits; and

(x)    filed corporate and payroll tax returns (e.g., Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the health care professionals were independent contractors.

162.    By electing to treat the healthcare professionals as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)    avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)    avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the health care professionals.

163.    Because the health care professionals were independent contractors and performed the Fraudulent Services, the Defendants never had any right to bill or collect PIP Benefits in connection with those services.

164.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of Core Chiro to make it appear as if the services were eligible for reimbursement.

165.    The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

166.    In some cases, the Defendants' attempted to conceal the fact that the Fraudulent Services were performed by independent contractors by falsely listing Lam on the billing as the treating provider, when in fact he did not provide the underlying treatments or services.

**III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

167.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through Core Chiro to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

168.    The NF-3, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

   (i)    The NF-3, HCFA-1500 forms and supporting documentation submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

   (ii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others;

   (iii)  The NF-3, HCFA-1500 forms and supporting documentation submitted to GEICO by and on behalf of Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and

(iv)    With the exception of NF-3 forms, HCFA-1500 forms, and treatment reports covering services actually performed by Onyema, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by, and on behalf of, the Defendants uniformly misrepresented to GEICO that the Defendants were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed.  In fact, the Defendants were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent they were provided at all.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

169.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

170.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

171.    Specifically, the Defendants knowingly misrepresented and concealed facts related to Core Chiro in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

172.    Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

173.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

174.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the health care professionals associated with Core Chiro in order to prevent GEICO from discovering that the health care professionals performing many of the Fraudulent Services were not employed by Core Chiro.

175.    Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

176.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

177.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $80,400.00 based upon the fraudulent charges.

178.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against Lam and Core Chiro
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

179.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

180.    There is an actual case in controversy between GEICO and Core Chiro regarding more than $1,398,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

181.    Lam and Core Chiro have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

182.    Lam and Core Chiro have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

183.    Lam and Core Chiro have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

184.    Lam and Core Chiro have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of Core Chiro.

185.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)   Lam and Core Chiro have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)  Lam and Core Chiro have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others;

(iii) Lam and Core Chiro have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iv)  Lam and Core Chiro have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of Core

## AS AND FOR A SECOND CAUSE OF ACTION
### Against Lam
### (Violation of RICO, 18 U.S.C. § 1962(c))

186.    GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

187.    Core Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. §

1961(4), that engages in activities which affect interstate commerce.

188.    Lam knowingly has conducted and/or participated, directly or indirectly, in the

conduct of Core Chiro's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United

States mails to submit or cause to be submitted hundreds of fraudulent charges on continuous basis

for more than two years seeking payments that Core Chiro was not eligible to receive under the

No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Core Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Core Chiro's employees.   The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

189.    Core Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Lam operated Core Chiro, inasmuch as Core Chiro never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Core Chiro to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Core Chiro to the present day.

190.    Core Chiro is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Core Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

191.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $80,400.00 pursuant to the fraudulent bills submitted by the Defendants through Core Chiro.

192.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Lam and John Doe Defendants "1-10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

193.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

194.    Core Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

195.    Lam and John Doe Defendants "1"-"10" are employed by and/or associated with the Core Chiro enterprise.

196.    Lam and John Doe Defendants "1"-"10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Core Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Core Chiro was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the

level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Core Chiro obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Core Chiro's employees.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

197.    Lam and John Doe Defendants "1"-"10" knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

198.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $80,400.00 pursuant to the fraudulent bills submitted by Defendants through Core Chiro.

199.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against Lam and Core Chiro**
**(Common Law Fraud)**

200.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

201.    Lam and Core Chiro intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

202.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Core Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Core Chiro and Lam; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Core Chiro, when in fact many of the billed-for services were provided by independent contractors. The fraudulent billings and corresponding mailings submitted to GEICO that comprise the fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

203.    Lam and Core Chiro intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Core Chiro that were not compensable under the No-Fault Laws.

204.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $80,400.00 pursuant to the fraudulent bills submitted by Defendants through Core Chiro.

205.    Lam and Core Chiro extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

206.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against Lam and Core Chiro**
**(Unjust Enrichment)**

207.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

208.    As set forth above, Lam and Core Chiro have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

209.    When GEICO paid the bills and charges submitted by or on behalf of Core Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

210.    Lam and Core Chiro have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

211.    Lam and Core Chiro retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

212.    By reason of the above, the Lam and Core Chiro have been unjustly enriched in an amount to be determined at trial, but in no event less than $80,400.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Against John Doe Defendants "1-10"
### (Aiding and Abetting Fraud)

213.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

214.   John Doe Defendants "1"-"10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Lam and Core Chiro.

215.   The acts of John Doe Defendants "1"-"10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the start-up and operation of Lam's transient chiropractic operation, arranging and facilitating the referral of Insureds to Core Chiro in exchange for illegal kickbacks, and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

216.   The conduct of John Doe Defendants "1"-"10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1"-"10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Lam or Core Chiro to operate at the Clinics, obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

217.   John Doe Defendants "1"-"10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Lam and Core Chiro for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

218.   The conduct of John Doe Defendants "1"-"10" caused GEICO to pay more than $80,400.00 pursuant to the fraudulent bills submitted through Core Chiro.

219.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

220.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

221.     Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Lam and Core Chiro, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Lam and Core Chiro have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Lam, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $80,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Lam and John Doe Defendants "1"-"10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $80,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Lam and Core Chiro, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $80,400.00, together with

punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.       On the Fifth Cause of Action against Lam and Core Chiro, more than $80,400.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

F.       On the Sixth Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $80,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: November 17, 2021
       Uniondale, New York

RIVKIN RADLER LLP

By:    */s/ Michael Sirignano*
Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Melissa D. Medilien, Esq.
926 RXR Plaza
Uniondale, New York 11556
 (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*